22-1184 Lambland v. Heartland Biogas I'm going to take a stab at pronouncing your name. Ms. Masioki? Pretty close. Ms. Shockey. Not close at all, but thank you. Ms. Shockey? Is that right? Correct.  Good morning, and may it please the Court, my name is Steve Masioki. I represent Heartland. The District Court made multiple errors here before, during, and after trial. I plan to focus on three, each of which involves an issue of law. First, in granting summary judgment on liability, the Court erred by holding that the CDPHE rule was unclear as to whether and how a CD could transfer, and also by finding that regulators' dealings with Heartland as a matter of law weren't enough to raise a fact issue as to whether the CD transferred. Let me, I am, this posture is very confusing to me, the way this case has come up. The summary judgment, the sole issue raised was whether or not you had the CD. Correct. And yet, there was, I mean, you shut down and stopped taking substrate. Correct. So, I mean, that's obviously a default under the contract, so I'm very confused why all of the energy is in whether or not you have a CD, because that's not the only way you can breach this contract. Yet, oddly, it's the only issue that was raised on summary judgment. So, help me out here. I will help you out, Your Honor. First of all, you're right. The sole issue that A1 raised in its summary judgment motion and the sole issue the Court decided with respect to liability was whether or not we had a CD. The theory, as you recall, is that Heartland warranted that its performance wouldn't violate a law and that this was a violation of a law. In their response brief now, they say, well, the Court made an additional unchallenged finding of breach, which was the inability to accept more substrate. Well, and the Court did, but it's in its ruling on a motion in limited. Correct. It's not in its order on summary judgment. That's right. I think the Court is absolutely correct that the only breach here isn't whether you do or don't have a CD. That isn't what was argued. So, I'm perplexed. Okay, so here's how you dispel your confusion. Heartland had no duty under the substrate services agreement to accept any amount of substrate. What Heartland had is a right, in its sole discretion, to forecast how much substrate it needed. And it could and did in this case forecast that its substrate needs were zero. Its duty at that point was not to pay whatever damages. Well, it eventually forecast zero, but that was after it approved five-year contracts with third parties for bringing substrate. So, you might have an argument about good faith and all of that, but that argument isn't before us. Yeah, correct. Before we move on, the other issue is what did you do in Colorado to challenge the decision of the county that you did not have a CD? We have brought a takings case in State District Court. Okay, but did you go, I mean, I assume there's administrative review, some process? There was no direct administrative appeal within the state court system. There was a takings case against BOCC and CDPHE. So, that's what we did. So, you said there's, you're not saying there's no review. You're saying you didn't pursue that review.  But you're saying there's no review available through the Administrative Procedures Act of the state of Colorado. That's really not something that has come up in either of these cases. Well, the reason it comes up here is we've got a Rooker-Feldman issue, right? State court losers can't come to the federal court and ask us to make a decision different than the state court may, right? And so, you know, we've got, we're in kind of an odd posture to be second guessing the county on what it thinks is required to have a CD. So, it's all interrelated what happened here in terms of the posture before us, which is why the way this comes up to us is very odd. Okay, I understand that. Just to put the punctuation mark on the substrate services agreement, again, our sole duty there was to pay any net diversion costs. And that was our duty. Well, and as I look at that contract, if it were force majeure, the damages are very clearly limited. Correct. Earlier, you mentioned force majeure in your opposition to summary judgment in like one sentence, and then we never hear of it again. Have you walked away from the argument that this was a force majeure? No, Your Honor. We certainly have not. With respect to the diversion costs, that is all they can get with respect to, you know, the shutdown and the inability to get substrates. They can get nothing more than the diversion costs, part of which we paid them and part of which they got in damages. Can you point me to the part of your contract of the substrate agreement that says that even if it's not a force majeure, damages are limited to the contingency plan? 5.2, 5.6, 8.2, and 9.3. So, 5.2, 5.6, 8.2, and 9.3. Okay, thank you. With respect to the issue about whether the rule allowed transfer, again, the rule says that it could transfer to a new owner or a CD may not be transferred to an owner unless, and then it says, as part of the process, approved financial assurance is provided. The rule did not set forth more requirements. We provided that financial assurance, CDPHE and BOCC approved it, and the county repeatedly acknowledged that Heartland possessed a CD. So, let me back you up there. So, it seems like we're not giving effect to part of the language of the rule, because if it says that, as part of the process, it has to be reviewed and approved by the department. Correct. That suggests there are other things that have to happen, too, to get it transferred. And there were other things that happened here. Indeed, the underlying document is called an E-DOP, and that is the document that has all the technical requirements for the operation, and that was reviewed by CDPHE and approved. I point you to Exhibit 34 to our response to the summary judgment brief, which is at Record Volume 6, page 206. There, CDPHE said that we had actually decided to move the DPS on site rather than having it at A1's facility. And if you'll recall, we agreed to actually pay for that DPS and then rent it back to them. And the CDPHE approved that and said, we don't believe that any change is necessary to Heartland CD as a result of that change. And so there were other parts of the process, but they repeatedly, both regulators, repeatedly approved and indicated that we had a CD. Finally, there are estoppel principles at play here as well. We built a $100 billion— Isn't it generally the case that estoppel won't flow against the government? Say it again? They said, isn't it generally the case that estoppel won't flow against the government? Not in Colorado, not under Colorado law and the case law we provided you. And that would include the Stackhouse case. We built a $100 million facility based in reasonable reliance on these repeated assurances that we had a CD, that we had all the necessary approvals. And if you look at the Stackhouse case, indeed, estoppel can lie against the government in these circumstances. I'd like to move on and address at least briefly— Your Honor. It seems to me if you had a contractual obligation to have a CD and you didn't get it, you're liable to the other party to the contract. You then have claims against the government where you can get redress from the government. So why does that affect the claim against you? And we, in fact, are pursuing those claims against the government in a parallel case. And if you win, then you can be compensated for anything you lose in this lawsuit based on failure to have the CD. Why is that? And our theory in that case is indeed that we had a CD. And beyond that, that we had a property interest in that CD. And we survived summary judgment in that case. And we expect findings and conclusions to come out really any time now, certainly this spring sometime. But we're making that argument there. And these issues overlap. Well, you know, I mean, I keep coming back to whether you had a CD or you didn't have a CD, they shut you down. Correct. You couldn't operate the facility and you couldn't accept substrates, which could be an event of default under the contract. Right. For which the sole remedy is paying the diversion cost. Well, I guess that's an issue for, you know, the court didn't decide damages yet. Right. But whether you eventually convince somebody that they were wrong and you were right about the CD process, you couldn't operate the facility and you couldn't accept substrates. And if the failure to accept substrates is a breach, then you have to pay damages. Whether you all day long can beat your chest and say, we really had a CD. Yes. But again, the failure to accept substrates, the sole remedy for that is... A contingency plan. Correct. That's correct. Let me make sure I'm clear on this. So you have a final agency decision that you had no CD. Right. Colorado agency decision. I don't know if I'd even characterize it as that. We had two warring regulators, one of them saying, let them keep operating. But we do have a decision... Then why didn't you keep operating if there was no decision saying you didn't have one? We have an affidavit in the record saying that the shutdown of the facility was effectively a death sentence for this facility. No, I understand that. But why, I mean, if you didn't have a final decision that you had to shut down because you had no CD, why did you shut down? Well, the CD, and we explained this with respect to our offer of proof on causation. The lack of a CD didn't mean the regulators had to shut us down. They did shut us down in any event. And indeed, CDPHE urged the county not to do that. So it was not, the lack of a CD and the shutdown, one didn't necessarily follow through. How about this? How about if there was a determination that you absolutely had a CD, they couldn't have shut you down? No. You agree with that? I... No, because there could have been violations of the CD. I know, well, there weren't, that wasn't, that wasn't alleged, though. No. Well, they did, they said, we're shutting you, you're suspending operations for lack of a CD and other violations, including an odor violation, right? That's correct. They lumped them together. That's correct. But, yeah, I mean, this is just a very odd posture, this case, because you had, I don't know why you say you don't have a final agency decision that you didn't have a CD. It went through the process and the county was the final arbiter of what you needed to do, whether you did or didn't have a CD. And despite some individuals who may have disagreed with that decision, the county ultimately decided that you lacked a CD because it could not be transferred. It did make that decision, that's correct. Okay, so isn't that a final agency decision? I'm going to give you some extra time. Okay. So don't be so quick. All right. Go ahead and answer. You know, it may be, again, that's not an issue that has ever been argued in this case. And so it, in fact, it may be, but it's not an issue that has been addressed in this case. What we've been talking about so far is your liability for not having a CD. Correct. You say you had a CD. Correct. If it's determined that you didn't have a CD, are there any damages that you have to pay to agree that in that circumstance you would have to pay substantially more damages than just the transfer cost? If we did not have a CD? Well, that would segue into our arguments on consequential damages. You agree, though, that you would not be limited to just the transfer? You would not be limited to just the diversion cost, correct. I agree with that, Your Honor. But that, again, that would segue into, may I continue? Briefly, yeah. I'm going to keep a tight grain on you, but this is complicated and you can address it. Right, right. You're right. So if that's a breach and there is causation, then we get into the question of whether A1 could recover its lost profits. And our argument on lost profits is twofold. Number one, the contract, the SSA, prohibited recovery of consequential damages, and expressly so, and that the court erred in relying on the heading of that section in allowing the recovery of consequential damages. And what do you think are considered consequential damages that aren't recoverable? It's the tipping fees, which it's undisputed that the tipping fees were consequential damages. As to the marketing fees, the court held that they were general damages. Based on the case that Judge McHugh decided, the Solid FX case, our position is that these lost profits were dependent on contingent future deals with third parties. They were dependent on contracts with third parties for unknown quantities of substrates sold at undetermined prices. And based on Solid FX and the Allentech case that Solid FX relied on, if damages depend on contingencies that are beyond the contract itself, and that is true of the marketing fees, then those damages are consequential and they were barred by this contract. If consequential damages are barred, is there any difference in the damages available if you did or didn't have a CD? No. So the contingency plan and the diversion costs are all you can get, irrespective of the type of breach? Correct. Did you have another? You said you had four points to say. But we're going to go quickly through them as we just went through them. Just to conclude, even if in fact the contracts didn't bar these lost profits, which are consequential damages, AWADN didn't prove 20 years of lost profits with substantial evidence and reasonable certainty. It failed to deduct anything. Anything else? That's it. Thank you. Thank you. And add three minutes to her time. Three minutes. He went over three minutes, so I'm adding three minutes to your time. Thank you. That seems fair. I'm not sure I want that. You haven't heard his questions. Will you take those three minutes back? Good morning, and may it please the court. My name is Regina Drexler, and I'm here representing Lamb Landy. It's a Colorado company that does business as A1 Organics and has been operating in Colorado as a composting company since 1973. I'm joined at the table by A1's CEO and president, Travis Bonson, who was A1's principal witness in the district court. So you agree the only issue before us on this summary judgment is whether or not Hartland had a CD? No, I absolutely don't. That's all you argued before the district court. I've read it and reread it. Well, I'll tell you, and I did understand that argument from Hartland's counsel. I would point the court to the idea that A1 alleged more than one breach. In your complaint, you clearly alleged more than one breach. But when you brought a summary judgment motion, you brought it for the sole breach of not complying with law because they didn't have a CD. I agree that the issues are interrelated. I will point the court to our summary judgment brief, record four, pages 23 and 24, where A1 makes the argument Hartland refused to apply for a CD and instead shut down the facility. And then as a result, that's the next sentence, A1 suffered significant damages. I don't think that rescues your entire summary judgment that's written about a CD. Fair. I would point out also then that the parties were required to submit a matrix of undisputed facts to the court. And in that matrix, I'll direct the court to record seven, pages 53 to 55, A1 suffered damages as a result of Hartland's decision to shut down the facility. That's a specific record fact. That's record fact 37. Hartland responded to that record fact by denying it. But nevertheless, that was an issue that was raised in summary judgment. I will say that. Well, I mean, you made an argument to the district court that they were in breach because they didn't have a CD. And so they are arguing to us that there are material issues of disputed fact about whether they did or didn't have a CD. That's all that's before us, oddly. Well, I think more than that is before you. And the reason I think that is because of the argument that I just made. But then in addition to that, the district court made a finding that Hartland's additional conduct caused the facility shutdown to not be able to basically create the situation so that Hartland was not able to accept the waste from A1 as it promised to do. So that finding, that's a finding of liability, and that was not challenged on appeal by Hartland. And so that's an alternate finding of breach. And under this court's authority in Starkey, this court properly affirms the liability judgment on that basis alone. I'm happy to address the CD issue, and I think it's as a matter of law. You're saying that even if all you argued was liability rests on the lack of a CD, you're saying the district court recognized a different ground for liability? Because then preservation, we would do preservation a little differently, even if the court addressed something that may not have been preserved. So what are you saying? It was the alternative ground? That Hartland's additional conduct caused the facility to shut down so that it was not able to accept waste from A1. That's the additional and alternate finding. And I will say it ties back— Would you agree that the district court can't, without notice to the parties, generally start deciding cases on different grounds than presented? Again, I will say I believe that the grounds were presented as shut down. Okay, I heard your argument on that. Let's assume they weren't. If we assume they weren't, then the court stating in its summary judgment ruling recognized that once the facility ceased, the defendant was unable to accept substrate. So that ties into its later finding. I mean, I guess my concern is what you've read to us so far about this alternative finding of other conduct resulting in a breach not only seems to me was done without notice to the parties that it was going to be done, but also is very vague and basically unreviewable because the district court didn't tell us what other conduct was propping up the summary judgment. I recognize that that's an issue, so I will turn to addressing the CD. Let me pursue the issue. Sure. Procedurally, the way that would be addressed in this court is the appellant would claim that the district court erred in finding they didn't have a CD. In the response or answer brief, you would say even if the district court erred in that respect, there was an alternative ground for finding liability that was decided by the district court. And you would argue that as an alternative ground in your brief. And then the appellant would have the opportunity in the reply brief to say the district court had no right to decide it on that ground because that hadn't been presented to it. Now, was any of that done? Yes, we argued an alternate breach. And we said that Hartland didn't address that. Where did you address it? Let me go one more step. So you're saying you argued that as an alternative ground for affirmance. Did the reply brief say that it was improperly addressed by the district court because that issue had not been raised? No, I don't believe they raised it. I believe we raised it in the context of arguing that they waived that issue in our response brief. That they waived it when? In their opening brief? Yes, by not arguing it in the opening brief under Starkey that they waived it. So I return to you unless you have a question. Well, I think you've got judgment. Well, I don't want to run out of time before we talk about consequential and incidental damages. I recognize the provision is in the indemnity section of the contract, but as a general rule, titles and headings don't help us interpret the actual language on the page. And that paragraph starts, in no event will the parties be liable to the other party for any consequential, incidental, indirect, punitive, or special damages, including loss of profits, debt of business, or goodwill, in connection with the performance of this agreement. That's not talking about indemnity. That's one party's claim against the other. Then it goes to the end of that paragraph, and it says, except, provided that the waiver doesn't apply if you've got an indemnification obligation to a third party. Right. To get to section 10, you have to get to section 10 somehow, right? So you start at section 9.2, and 9.2 says, in the event that there is an event of default under this contract, and we're talking about the substrate services agreement here now, then you look to section 9.4, or you recover all your losses. And then losses are defined elsewhere very, very broadly in the contract. And then if you go to section 9.3, section 9.3 says, if you have non-performance under the contract, not amounting to an event of default, then you go to section 10. Then you're able to get additional remedies under section 10. So the only way you get to section 10 under the contract is if you don't have an event of default, you have non-performance, and then section 10 outlines, and I believe this is what the court relied on in terms of the multiple factors that it relied on in finding that the exclusion was not implicated here. You have section 10.1, Hartland's obligation to indemnify A1. 10.2, A1's obligation to indemnify Hartland. 10.3, indemnification procedures. All within the section titled indemnification, Hartland argues that that language that you cited envisions a claim between the parties. And that's exactly right, but an indemnification claim would always arise between the parties. It's based on a third party claim, but a third party makes a claim against one of the parties, then that party makes a claim against the other. So in all indemnification circumstances that arise under section 10, you would have a circumstance where there would be a direct claim. So your position would be that in a direct claim by your client against Hartland, there's no exclusion of consequential damages. But if it were a claim where someone else had sued you, and they're having to indemnify you against a claim by the third party, there would be an exclusion of indemnification for consequential damages. That's exactly right. And that kind of makes sense, because if you have an event of default, which is a straight breach of the contract, then you would expect to have broader remedies than you would have from a non-performance event from which an indemnification obligation might arise. But yet, if you look at that paragraph 10.4, it makes no sense under your analysis, because you're saying that first paragraph, the first part of it where it says party to party, that's only in the event of an indemnification obligation. Right. And yet, at the end of that paragraph, it says, provided this doesn't apply if you have an indemnification obligation. So it would be internally inconsistent in that paragraph to read it the way you just suggested. I don't believe that that's true. I mean, the way I read that language was not consistent with that. The way I read that language was basically the references to strict liability claims, product liability, warranty claims, those kind of things, those references within that section 10.4, those would only come up in an indemnification situation. OK. If they didn't have a CD, but it was because of the county acting arbitrarily and capriciously, would they then be able to claim this is a force majeure? No, they would not. And there's a very good reason that they wouldn't be able to. And there's a good reason that they didn't even argue that to the district court. And that is because the provision, the force majeure provision in the contract provides that if any force majeure event goes on longer than 180 days, it becomes an event of default. Yes, but if the event of default is caused by, is a force majeure event, damages are limited to the contingency plan. I don't believe that that's the case either. I mean, I heard that Heartland made that argument, but I believe that the contract damages are cumulative. I don't believe that there's any indication, nor was it argued that the contingency plan provided the exclusive remedy. I'll address the CD issue. Here, Heartland argues it had a CD by transfer under rule 1.8.4. In Colorado, there's only one way to get a CD, and that's by complying with the Solid Waste Act, completing a detailed application that's reviewed by the county and the state, and that is subject to public hearing and comment. So the Solid Waste Act in Colorado is silent as to transfers, right? It does not permit transfers. It doesn't permit or prohibit transfers. It does not include language that prohibits a CD transfer, that's true. It doesn't speak at all to transfers, but they have a rule that speaks to transfers. They no longer have a rule that speaks to... But they had a rule at the relevant time. They had a rule 1.8.4 at the relevant time said a CD could not transfer without, as a part of the process, having the financial assurances approved by both the state and the county. Okay, well, the implicit reading of that rule is that there is some method by which a CD can transfer, at least under the rule. I believe that the state agency, CDPHE, corrected that rule by... You can't look at the fact that they later repealed a rule to tell me why the rule that was relevant at the time is ineffective. Well, if the rule allowed for a CD transfer, it would be in violation of the Solid Waste Act. It's not in direct violation of the statute that's silent on the issue, is it? I believe it is, because the entire statutory framework of the Solid Waste Act requires a comprehensive application, a comprehensive review of... Well, they already did a traffic study, and now you have a change in ownership. Does it really make a lot of sense to do a second traffic study? Well, if the... There might be instances where things that were done for the prior CD that you could carry over. Well, in this case, we're talking about a solid waste facility. They have different operational plans. They have different rates. They have different hours of operation. There are neighborhood impacts. The neighborhood impacts could change over time. So I think with respect to the traffic study, it would depend on what the subsequent user intended to do, but I would assume there would be some review at that point. How much of the application process relates to the financial strength of the... It's a very... Yeah, it's a very small part of the review. So at that part, you can see why that might affect whether something could be transferred, but not if it's just a small part of it, not if it doesn't really make much difference. If they're very concerned about whether the new owner will be able to compensate victims or something like that, then you might be very interested in a transfer. But you're saying there's nothing about that in the licensing, really, or very little about that in the initial licensing, which suggests that why should they care if it's a new owner? Well, I don't mean to suggest that's unimportant. I think that's very important, and I think it's one reason that the CDPHE emphasized it in the regulation. But it is not the only factor. It's not the only important factor, and certainly there are many circumstances that could arise where one owner transferring to another owner would be completely inconsistent with the comprehensive review process that's required for each owner and operator. If you allowed a CD transfer, it would just undercut the entire purpose of the regulatory review. Why would that be any different from allowing the original licensee, the permit holder, to change its operation? Does it need to get a new CD in that circumstance? Often it does, and this is why, as Heartland was referring to, that they sent a letter to CDPHE asking, as a result of A-1's addition of the DPS, if that required a CD. So, yes, it requires changes. Thank you, counsel.